IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| AMANDA YVONNE COOPER, | CASE NO. 4:25-CV-1933 |
| PLAINTIFF, | DISTRICT JUDGE BENITA Y. PEARSON |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Amanda Yvonne Cooper filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying her applications for disability insurance benefits and supplemental security income. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural Background**

In May 2023, Cooper filed an application for supplemental security income and disability insurance benefits alleging a disability onset date of

March 2020.[1] *See* Tr. 206, 208, 243. Cooper alleged disability due to severe asthma, inability to stand for long periods, anxiety, depression, and post-traumatic stress disorder. *See* Tr. 248. The Commissioner denied Cooper's applications initially and on reconsideration. *See* Tr. 65, 76, 88, 100.

In March 2024, Cooper requested a hearing. Tr. 137. Administrative Law Judge ("ALJ") Frank Barletta held a telephonic hearing in October 2024. Tr. 38–63. Cooper appeared, testified, and was represented by counsel at the hearing. *See* Tr. 46. In November 2024, the ALJ issued a written decision, which found that Cooper was not entitled to benefits. Tr. 14–37.

In November 2024, Cooper appealed the ALJ's decision to the Appeals Council. Tr. 201. In July 2025, the Appeals Council denied Cooper's appeal, Tr. 1, making the ALJ's March 2024 decision the final decision of the Commissioner. Tr. 14–37; *see* 20 C.F.R. § 404.981.

**Evidence**[2]

*Personal and Vocational Evidence*

Cooper was born in 1976, making her approximately 44 on the alleged onset date. Tr. 65.

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[2] The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence that was cited in the parties' briefs and relevant to their arguments.

*Medical Evidence*

The ALJ summarized the medical evidence as follows:

> In terms of the claimant's physical impairments, a review of the medical evidence of record reveals the claimant presented to the emergency department on March 5, 2020 for foot pain after a motor vehicle accident one hour prior, which resulted in trouble ambulating the foot (Exhibit 4F/46). Imaging at that time showed fracture involving base and proximal shaft of the second metatarsal and possible subtle fracture at the base of the third metatarsal (Exhibit 4F/45). Imaging on April 15, 2020 again confirmed fractures of her right foot (Exhibit 5F/28). When establishing care with her primary care provider in November 2020, the claimant's BMI was 45.39, and was assessed with essential hypertension and obesity (Exhibit 2F/50). In August 2021, the record shows that the claimant was complaining of low back pain that had been more severe since July 2021, and was diagnosed with a lumbar strain (Exhibit 10F/23-24). Then in March 2022, the record shows further complaints of dyspnea upon exertion, as well as palpitations and BMI value of 46.09 (Exhibits 2F/35; 6F/2). The following month, the record shows that the claimant continued with shortness of breath, and her echocardiogram resulted in an ejection fraction of only 50-55% (Exhibit 5F/5). Primary care records from April 2022 also show a BMI of 44.92, and an assessment for COPD (Exhibit 2F/27). In December 2022, the record shows that the claimant still complained of shortness of breath with exertion and inability to catch her breath (Exhibit 5F/5). More recently, the record shows that the claimant presented for a consultative medical examination with Joseph Cataline, M.D., in October 2023, at which time she complained of back and leg problems, and exhibited positive exam findings of an unsteady gait, inability to squat, and inability to walk on her heels or toes (Exhibit 8F). Dr. Cataline further diagnosed the claimant with severe asthma (Exhibit 8F/5). In December 2023, office treatment records from Dr.

3

Domer show more foot pain after she slipped on steps, and she continued with sharp pain when walking on her right foot in March 2024 (Exhibits 10F/25; 16F/3).

As such, this evidence showing right foot fractures stemming from a motor vehicle accident on the alleged onset date, subsequent complaints of low back pain, dyspnea upon exertion, shortness of breath and palpitations, assessments for essential hypertension, COPD, and asthma, echo findings of lower ejection fraction, obese BMI values over 40, positive consultative medical exam findings with respect to her gait, reinjury to her foot in December 2023, and continued right foot pain into March 2024, supports the limitation to sedentary exertional work with occasional climb of ramps, stairs, ladders, ropes, or scaffolds, balance, stoop, kneel, crouch, and crawl, and avoidance of all exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, and other pulmonary irritants, and hazards.

Despite these physical impairments and positive examination findings, the record also shows that the claimant still had good range of motion of all major joints when presenting to the emergency department on the alleged onset date (Exhibit 4F/46). In fact, by May 13, 2020, office treatment records from Timothy Domer, D.O., indicate that there had been some progressive healing of her fractures, and the claimant was able to begin weaning out of her walker boot to weight bearing as tolerated (Exhibit 10F/11). When returning to Dr. Domer in June 2020, he noted that overall, everything seemed to be coming along nicely, and she had a good gait pattern (Exhibit 10F/13). Dr. Domer then noted sufficient healing in September 2020, and in March 2021, the claimant stated that overall, she was doing really good with only occasional mild foot pain (Exhibit 10F/15, 19). Chest imaging in November 2020, and December 2020, and February 2022 showed normal PA and lateral chest, no acute pulmonary infiltrate, and no definite radiographic of acute cardiopulmonary disease

4

(Exhibits 2F/24; 4F/12, 44). With regards to her lumbar strain, her August 2021 x-rays shows no acute changes, and Dr. Domer treated symptomatically (Exhibit 10F/23). Physical exams in March and April 2022 showed no distress, normal general appearance, no heart murmurs, regular heart rate and rhythm, clear lungs to auscultation bilaterally, normal back, full range of motion, normal extremities, full alertness and orientation, no extremity clubbing, cyanosis, or edema, normal neurologic, and normal gait (Exhibit 2F/27, 35, 38). Cardiology exams in March and April 2022 showed normal findings of normal carotid upstroke, normal jugular venous distension, clear to auscultation, normal breath sounds, normal S1 and S2, no pitting edema, normal peripheral pulses, and normal strength, tone, and reflexes (Exhibit 6F/2). Additional chest imaging in December 2022 showed no active cardiopulmonary disease and no significant interval change identified compared to her November 2020 x-rays (Exhibit 3F/1).

Continuing into 2023, primary care records show normal physical exam findings of no acute distress, no heart murmurs, regular heart rate and rhythm, no extremity clubbing, cyanosis, or edema, normal motor strength in the upper and lower extremities, and intact sensation (Exhibit 5F/2). Another cardiology exam in March 2023 showed normal findings of normal carotid upstroke, normal jugular venous distension, clear to auscultation, normal breath sounds, normal S1 and S2, no pitting edema, normal peripheral pulses, and normal strength, tone, and reflexes (Exhibit 6F/7-8). Primary care records from September and December 2024 show no acute distress, normal motor strength, and intact sensation (Exhibit 9F/4-5, 7). Her October 2023 consultative medical examination resulted in many normal findings as well, including clear lungs to auscultation and percussion bilaterally, no clubbing, cyanosis, or edema, normal neurologic, intact sensation, normal reflexes, 5/5 motor strength, unassisted gait, and normal range of motion (Exhibit 8F). Finally, imaging in January 2024 showed

healing third and fourth metatarsal shaft fractured of right, which were healed upon imaging in June 2024 (Exhibit 16F/1, 9).

As such, the claimant's statements about the intensity, persistence, and limiting effects of her physical symptoms are inconsistent with this evidence of record showing good range of motion of all major joints at the alleged onset date, progressive healing of her fractures in just two months, sufficient healing of her fractures by September 2020, only mild foot pain, consistency normal chest imaging results, no changes on lumbar x-rays, normal physical and cardiology range of sedentary exertional work as set forth above.

In terms of the claimant's mental impairments, a review of the medical evidence of record reveals medication treatment for anxiety, major depressive disorder, and PTSD through her primary care provider (Exhibits 2F; 5F; 9F). During a September 2023 consultative psychological examination with Kenneth Gruenfeld, Psy.D., the claimant indicated that she left her last job for working too slowly and failing to carry out job tasks, and she complained of depression, memory issues, lack of motivation, and symptoms of anxiety and trauma (Exhibit 7F). As a result, Dr. Gruenfeld diagnosed the claimant with major depressive disorder and PTSD (Exhibit 7F/5). The record then shows that the claimant began mental health treatment for major depressive disorder and generalized anxiety disorder with Cope Treatment Center in December 2023 (Exhibit 11F). As such, this evidence showing medication treatment for anxiety, PTSD, and depression, continued complaints of depression, memory issues, lack of motivation, and symptoms of anxiety and trauma, supports the limitation to understand, remember and carry out simple instructions, performance of tasks that do not involve a specific production rate pace, such as assembly line work or an hourly production quota, occasional changes in a routine work setting, and occasional interaction with co-workers, supervisors and the public.

Despite these mental impairments and positive examination findings, the record also shows that when following up with her primary care provider in March 2022, the claimant stated that her mood and anxiety were both much better, and her psychiatric exam noted good judgment and insight, neatly dressed, and future oriented (Exhibit 2F/34). The next month, the claimant stated she was doing well on anxiety medications, and her psychiatric exam noted the same normal findings (Exhibit 2F/26-27). Her September 2023 consultative mental status examination with Dr. Gruenfeld resulted in normal findings as well, including full alertness, well groomed, appropriate hygiene, appropriate eye contact, no hostile or aggressive behavior, normal speech, normal mood and affect, no anxiety, normal mental content, full orientation, good concentration, and intact insight and judgment (Exhibit 7F). As such, the claimant's statements about the intensity, persistence, and limiting effects of her mental symptoms are inconsistent with this evidence of record showing her doing well on anxiety medications, normal psychiatric exam findings, normal consultative mental status exam findings, and no inpatient psychiatric treatment history, which supports her ability to perform a reduced range of unskilled work as set forth above.

In addition to the above medical evidence of record, the undersigned considered the claimant's activities of daily living. The claimant reported that she remains able to live with her boyfriend, make coffee, do chores around the house, do laundry and dishes, take care of her cat, take her medicine with reminders, prepare her own simple meals daily, watch TV, use a tablet, run the vacuum, use a microwave, take out the garbage once per week, ride in a car, shop by computer, manage money, build puzzles, and text (Exhibits 4E; 8E; 7F/3; Hearing Testimony). While the undersigned acknowledges that the claimant has some limitations performing these activities, and while none of these activities is dispositive, taken together and considered in conjunction with the above medical evidence of

7

record, they suggest that the claimant can perform work within the above parameters on a sustained and continuous basis.

Tr. 25–27.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2024.

2.  The claimant has not engaged in substantial gainful activity since March 5, 2020, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.  The claimant has the following sever impairments: multiple fractures of right food with Lisfranc injury, lumbar strain, COPD, asthma, essential hypertension, obesity, major depressive disorder, post-traumatic stress disorder (PTSD), and generalized anxiety disorder (GAD) (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following limitations. The claimant is limited to occasionally climbing of ramps, stairs, ladders, ropes, or scaffolds. The claimant could occasionally balance, stoop, kneel,

8

crouch, and crawl. The claimant must avoid all exposure to extreme cold, fumes, odors, dust, gases, poor ventilation, and other pulmonary irritants, and hazards. The claimant can understand, remember and carry out simple instructions. The claimant can perform tasks that do not involve a specific production rate pace, such as assembly line work or an hourly production quota. The claimant can deal with occasional changes in a routine work setting. The claimant can have occasional interaction with co-workers, supervisors and the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 2, 1976 and was 43 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45–49 (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, 416.969a).

9

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 5, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 19–31.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not

> disabled. If not, the ALJ proceeds to the next step.
>
> 5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than

11

a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

1. *The ALJ appropriately considered the Dr. Kaur's opinions.*

Cooper first challenges the ALJ's analysis of the opinion of her primary care provider, Dr. Kaur. Doc. 6, at 14. In particular, Cooper argues that the ALJ improperly articulated his analysis of Dr. Kaur's mental medical source statement. *See id.*

12

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

13

As to Dr. Kaur's opinions, the ALJ said this:

> The undersigned considered the Physical and Mental Medical Source Statements provided by Amandeep Kaur, who indicated limitations that would preclude full-time work on a consistent basis, such as standing and/or walking 1 hour and sitting 2 hours total in an 8-hour workday, inability to do any work for more than 15-20 minutes, more than 4 absences per month, as well as several marked mental functioning limitations. The undersigned does not find this opinion persuasive, as Ms. Kaur does not even support such extreme limitations with any objective medical evidence of record, reference to treatment history, or diagnostic imaging results. Additionally, this opinion is not consistent with the evidence of record that has shown her good range of motion of all major joints at the alleged onset date (Exhibit 4F/46), progressive healing of her fractures in just two months (Exhibit 10F/11), sufficient healing of her fractures by September 2020 (Exhibit 10F/15, 19), only mild foot pain (Exhibit 10F/19), consistency normal chest imaging results (Exhibits 2F/24; 3F/1; 4F/12, 44), no changes on lumbar x-rays (Exhibit 10F/23), normal physical and cardiology exam findings (Exhibits 2F/27, 35, 38; 5F/2; 6F/2, 7-8; 8F; 9F/4-5, 7), and healed fractures again in 2024 (Exhibit 16F).

Tr. 28.

For starters, the ALJ did discuss the supportability and consistency of Dr. Kaur's medical source statements. As to supportability, the ALJ explained that Dr. Kaur's statements were not persuasive because she "does not even support such extreme limitations with any objective medical evidence of record, reference to treatment history, or diagnostic imaging results." Tr. 28; *see also* 20 C.F.R. § 416.920c(c)(1). And, as to consistency, the ALJ explained that "this opinion is not consistent with the evidence of the record" and then

14

proceeded to list examples of record evidence that were not consistent with the extreme limitations to which Dr. Kaur opined. Tr. 28; *see also* 20 C.F.R. § 416.920c(b)(2).

Moreover, the ALJ's statement generally discounting Dr. Kaur's limitations as unsupported does not warrant remand because Dr. Kaur's mental medical source statement was rendered on a check-the-box form, which "is patently deficient." S*ee Dollinger v. Comm'r of Soc. Sec.*, No. 22-3359, 2023 WL 1777386, at *4 (6th Cir. Feb. 6, 2023) (a check-the-box form completed by a treating source which only contained a brief explanatory note for the assessed limitations "is the kind of 'vague and unhelpful' opinion that is patently deficient and could not have been credited by the Commissioner") (quoting *Price v. Comm'r Soc. Sec. Admin.*, 342 F. App'x 172, 176 (6th Cir. 2009) (doctor's reference to "testing" to support his conclusions on a questionnaire were "vague and unhelpful" and did not provide substantial evidence to support his conclusions)). Indeed, Dr. Kaur's mental medical source statement, the analysis of which is the only aspect of the ALJ's decision that Cooper objects to in her first issue, is about two pages of checkboxes without any citation to other evidence or specific testimony. *See* Tr. 632–33. The only written explanation for the boxes checked in Dr. Kaur's mental medical source statement is "pt reports impairments as above." Tr. 633. So, the ALJ's statement that he "does not find this opinion persuasive, as Ms. Kaur does not even support such extreme limitations with any objective medical evidence or

15

record, reference to treatment history, or diagnostic imaging results[,]" Tr. 28, was appropriate given the patently unpersuasive nature of Dr. Kaur's check box opinion.

Kaur's first issue thus does not support remand.

2.      *The ALJ did not err in his analysis of Dr. Gruenfeld's opinion.*

Cooper next argues that the ALJ erred by discounting Dr. Gruenfeld's opinion as vague. This argument is flawed. For starters, vagueness is an acceptable reason to reject an opinion. *Woodard v. Comm'r of Soc. Sec. Admin.*, No. 5:22-cv-1728, 2023 WL 6005004, at *10 (N.D. Ohio July 27, 2023) ("Opinions that express functional limitations in vague terms can be discounted as not describing any functional limitations at all.") (citing *Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 431 (6th Cir. 2018)), *report and recommendation adopted*, 2023 WL 5842016 (N.D. Ohio Sept. 11, 2023. So, to the extent that Cooper's argument is that the ALJ could not find Dr. Gruenfeld's opinion less persuasive because it was vague, that argument fails.

To explain his analysis of Dr. Gruenfeld's opinion, the ALJ said this:

> After examining the claimant in September 2023, consultative psychological evaluator, Dr. Gruenfeld, indicated that the claimant will struggle to carry out future job tasks with any degree of consistency, will work slower than others due to her issues of focus and motivation and issues with anxiety and memory loss, struggle to complete simple and especially multi-step job tasks and a combination of tasks that require multi-tasking, and should be able to effectively work with others but would struggle

16

during times of high anxiety (Exhibit 7F/5). The undersigned does not find this opinion persuasive, as not only does it provide vague and ill-defined mental functioning abilities, but such limitation is also not supported by Dr. Gruenfeld's own mental status examination findings of full alertness, well groomed, appropriate hygiene, appropriate eye contact, no hostile or aggressive behavior, normal speech, normal mood and affect, no anxiety, normal mental content, full orientation, good concentration, and intact insight and judgment (Exhibit 7F). Additionally, this opinion is not consistent with the other evidence of record of doing much better with her depression and anxiety with conservative medication management, normal psychiatric exam findings of her primary care provider, as well as the opinions of the State agency psychological consultants at both the initial and reconsideration levels.

Tr. 29.

The ALJ stated that Dr. Gruenfeld's opinion was unpersuasive because it "provide[d] vague and ill-defined *mental functioning abilities*" and because the opined limitations were "not supported by Dr. Gruenfeld's own mental status examination findings." *Id* (emphasis added). On this point, and as the ALJ summarized, Dr. Gruenfeld's functional ability assessment provided that Cooper would:

> struggle to carry out future job tasks with any degree of consistency, will work slower than others due to her issues of focus and motivation and issues with anxiety and memory loss, struggle to complete simple and especially multi-step job tasks and a combination of tasks that require multi-tasking, and should be able to effectively work with others but would struggle during times of high anxiety.

17

*Id*.; *see also* Tr. 539. Notably, the ALJ's summary of these functional abilities immediately preceded his statement that Dr. Gruenfeld's opinion contained "vague and ill-defined mental functional abilities." Tr. 29. So Cooper's claim that "the ALJ does not articulate what in the findings he found vague or ill-defined" is belied by the record. *See* Doc. 6, at 17. The ALJ stated that the aspect of Dr. Gruenfeld's opinion which he found *vague and ill-defined* were Cooper's assessed *mental functional abilities*. Tr. 29. Contrary to Cooper's argument, therefore, the Court need not speculate about the ALJ's reasons for stating that Dr. Gruenfeld's opinion was vague. Rather, it need only read the preceding sentence.

Additionally, as the Commissioner highlights, the ALJ not only found Dr. Gruenfeld's opinion vague, but he also found it unpersuasive because it lacked adequate support and was inconsistent. *See* Tr. 29. Cooper thus understandably does not challenge the ALJ's compliance with applicable regulations mandating the ALJ consider the supportability and consistency of medical opinions. *See* 20 C.F.R. § 416.920c(a). Instead, her only challenge is to the ALJ's rejection of Dr. Gruenfeld's opinion as vague, which for the reasons stated, does not provide a basis for remand.

     *3.     The ALJ did not mischaracterize the medical evidence.*

Cooper next argues that the ALJ mischaracterized various aspects of the evidence which "portray[ed] a skewed perspective of [her] treating history and severity of her conditions." Doc. 6, at 18. In particular, she claims that the ALJ

18

"mischaracterized [her] medical records by failing to include certain relevant and critical findings as to [her] physical and mental conditions." *Id.* at 19.

Under applicable regulations, the ALJ must consider the entire record. A duty to "consider" the evidence, however, is different than a duty to "discuss" the evidence. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (quoting *Loral Defense Systems–Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999)); *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand.").

Cooper points to three alleged mischaracterizations, which as addressed in turn below, amount to a dispute over the ALJ's *discussion* of the record evidence.

*First*, Cooper takes issue with the ALJ's explanation of chest imaging that, according to Cooper, was discussed as "evidence supporting [her] improved physical condition." Doc. 6, at 19–20. Specifically, she claims that "to say that the imaging conducted in December 2020 and February 2022 [was] solely to confirm no signs of cardiopulmonary disease would be an inaccurate and convenient reading of the record." *Id.* at 19–20. The ALJ however did not say what Cooper implies he did. Instead, as Cooper acknowledges, the ALJ said that: "Chest imaging in November 2020, and December 2020, and February

19

2022 showed normal PA and lateral chest, no acute pulmonary infiltrate, and no definite radiographic of acute cardiopulmonary disease (Exhibits 2F/24; 4F/12, 44)." Tr. 26. In other words, the ALJ did not make the characterization that *Cooper says* he did, i.e. that the imaging was "solely to confirm no signs of cardiopulmonary disease." Doc. 6, at 19. Rather, the ALJ accurately recounted what the imagining revealed.

Cooper makes much of the fact that the ALJ did not discuss the chest imaging in connection with her mental impairments or that, based on the normal chest imaging results and related emergency department examination, the doctor's ultimate conclusion that Cooper experienced an anxiety attack. *See* Doc. 6, at 20. While the doctors may have ultimately diagnosed Cooper's symptoms as arising from an anxiety attack, *see* Tr. 461, that does not mean the ALJ's description of the evidence was a *mischaracterization*. Indeed, the ALJ didn't doubt that Cooper's anxiety was an issue; he determined that generalized anxiety disorder was among Cooper's severe impairments, Tr. 20, and discussed her anxiety symptoms and treatment, Tr. 27–29. Cooper, however, provides no support for her apparent argument that remand is necessary simply because the ALJ did not specifically *discuss* the emergency department's conclusion that Cooper likely experienced an anxiety attack, rather than a cardiovascular event. Perhaps this is because, as Cooper acknowledges, the ALJ is not required to *discuss* all of the evidence. *See* Doc. 6, at 18–19. Instead, the ALJ must only *consider* the entire record. *See e.g.*, 20

20

C.F.R. § 404.1529; 20 C.F.R. § 416.929; Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017).

Here, the ALJ specifically stated that he considered the entire record. *See* Tr. 24. Nothing Cooper cites contradicts the ALJ's presumptively true statement that he considered the entirety of the medical record. *See NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 163 (2d Cir. 2021); *see also United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *cf. Higgs v. Bowen*, 880 F.2d 860, 864 (6th Cir. 1988) (noting that the Appeals Council "state[d] that it 'considered the entire record which was before the administrative law judge, including the testimony at the hearing'"). As far as can be discerned, Cooper simply disagrees with the ALJ's choice to discuss her normal chest imaging in connection with her physical symptoms. Nothing she cites shows that this choice warrants remand.

*Second*, Cooper takes issue with the ALJ's discussion of her foot injuries. Doc. 6, at 21–22. She claims that the "ALJ once again demonstrates a convenient reading of the record, selectively pulling out portions of the evidence to fit the narrative [she] is not disabled with the requisite intensity, persistence, and limiting effect." *Id.* at 21. Review of the record, however, illustrates that the ALJ discussed much more than Cooper claims. For

21

example, Cooper claims that the ALJ refused to account for findings of her chronic pain even after she re-fractured her foot. Doc. 6, at 22. But the ALJ did discuss Cooper's multiple foot fractures and the fact that Cooper reported "sharp pain" as recently as March 2024. *See* Tr. 25. Among other records, the ALJ also discussed that Cooper's medical records from September and December 2024 showed "no acute distress, normal motor strength, and intact sensation;" that the October 2023 consultative examination records showed "unassisted gait;" and that as of June 2024, imaging of Cooper's foot showed that her fractures were healed. *See* Tr. 26.

All of this aside, and even assuming that the ALJ didn't specifically discuss some of the evidence that Cooper cites in her brief, the ALJ was not required to *discuss* every piece of evidence—the ALJ is simply required to *consider* the entire record. *See Kornecky*, 167 F. App'x at 508. The ALJ said that he considered the entire record, Tr. 24, and nothing Cooper cites shows that the ALJ failed to do what he said he did. Absent evidence to the contrary, which Cooper has not provided, the Court presumes that the ALJ's statement is true. *See Newark Elec. Corp.*, 14 F.4th at 163; *see also Chemical Found., Inc.*, 272 U.S. at 14–15 ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("an ALJ's failure to cite specific evidence does not indicate that it was not considered") (citation

omitted). Further, Cooper's citation to evidence which she apparently believes supports a different outcome does not support remand. Instead, it simply illustrates that she is asking this Court to review the evidence and place greater weight on the evidence she cites. It is not this Court's role to weigh the evidence. Rather, weighing the evidence lies within the ALJ's province. *See* 20 C.F.R. § 404.1520c(a) (explaining how *the ALJ* will consider and weigh medical opinions and prior administrative medical findings); *see also Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 196 (6th Cir. 2020)) ("this court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job."). And the fact that Cooper can point to evidence that she believes could support a different outcome, does nothing to show that the ALJ's decision was unsupported by substantial evidence. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). It is entirely possible for the same record to support disparate outcomes. *See Jones*, 336 F.3d at 477 ("we must defer to an agency's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'").

*Third*, Cooper argues that the ALJ assessed her mental impairments and reached his stated conclusions regarding her mental impairments "based on a convenient mischaracterization of the record." Doc. 6, at 23. Specifically, it appears that Cooper believes the ALJ erred by improperly placing weight on treatment records from March and April 2022, which indicated improvements

to her mental health, "to completely disregard any future evidence of mental health limitations." *Id*. In so arguing, Cooper points to evidence about her mental health treatment after April 2022 that shows, in her view, worsening symptoms. *Id*., at 23–24. But, as explained, the ALJ stated that he considered the entire record. *See* Tr. 24. And Cooper's citation to evidence that the ALJ did not focus on or cite explicitly, does nothing to overcome the presumption that the ALJ's statement is true. *Newark Elec. Corp*., 14 F.4th at 163. Indeed, much of the evidence that Cooper cites *was* summarized in the ALJ's decision. *Compare* Doc. 6, at 23–24 (discussing that Cooper sought mental health treatment in December 2023), *with* Tr. 27 (discussing that Cooper sought mental health treatment in December 2023).

In sum, the arguments raised in Cooper's third issue simply ask the Court to reweigh the evidence and do not provide a basis for remand.

*4. The ALJ properly evaluated Cooper's activities of daily living.*

As her fourth and final issue, Cooper challenges the ALJ's evaluation of evidence concerning her activities of daily living. Although you wouldn't know it from reading Cooper's opening brief, a claimant's ability to complete daily activities can be relevant to an ALJ's evaluation of the claimant's symptoms. *See* 20 C.F.R. § 404.1529(a), (c)(3); *see also Ranallo v. Comm'r of Soc. Sec*., No. 19-cv-2714, 2021 WL 50856, at *9 (N.D. Ohio Jan. 6, 2021).

Cooper argues that the ALJ erred by "either remov[ing] the context of [her daily] activities or fail[ing] to take into consideration offsetting

24

circumstances." Doc. 6, at 25. To support this argument, Cooper cites various portions of the record and her testimony that she claims the ALJ "fail[ed] to recognize." *Id*. But Cooper's claim is belied by the record. For instance, Cooper claims that the ALJ failed to recognize that Cooper testified that: "she can only do chores for about ten to fifteen minutes before needing to sit down," "she cannot carry laundry down the stairs or across a room[,]" she can only vacuum "with breaks[,]" and her fiancé helps her around the house. *Id*. But, the ALJ did acknowledge all of these aspects of her testimony. *See* Tr. 24 (noting that, among other topics, Cooper testified "she has to take breaks ever 10-15 minutes while doing household chores due to her right foot issues" and that "her fiancé helps with the chores").

Additionally, in expressing her disagreement with the ALJ's assessment of her daily activities, Cooper proposes that "a claimant's ability to perform daily activities is not always indicative of their ability to perform a full-time job." Doc. 6, at 26. But the ALJ never said that his RFC assessment was based only on Cooper's ability to perform certain daily activities. Instead, the ALJ based his RFC assessment on the entirety of the record, *see* Tr. 24, which also included Cooper's daily activities as a non-dispositive element. Nothing that Cooper cites shows that the ALJ's decision was not based on his consideration of the entire record or was unsupported by substantial evidence. *See Jones*, 336 F.3d at 477.

So Cooper's fourth issue also does not support remand.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the

Commissioner's decision.

Dated: March 19, 2026

*/s/ James E. Grimes Jr.*

James E. Grimes Jr.

U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).